UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SARSVATKUMAR PATEL,

**17-CV-2170 (NGG) (JO)**

        Plaintiff,

   -against-

LONG ISLAND UNIVERSITY

        Defendant.
-------------------------------------------------------------------X

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully Submitted,

Joshua Beldner
**TILTON BELDNER LLP**
626 RXR Plaza
Uniondale, NY 11556
P: (516) 262-3602
F: (516) 324-3170

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. i

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................. 1

ARGUMENT ................................................................................................... 2

POINT I
PLAINTIFF HAS ESTABLISHED RETALIATION CLAIMS
AGAINST DEFENDANT UNDER TITLE VII, NYSHRL, AND NYCHRL ....... 3

    A.  Plaintiff Engaged in Activity Protected By
        Title VII, NYSHRL, and NYCHRL ......................................................... 4

    B.  Causal Connection Between Protected Activity and Adverse Action ........ 6

    C.  The Reasons Provided By Defendant Are Pretext .................................... 8

        1.  Dean Gross's Testimony is Contradicted by the Entire Record ............ 8

        2.  Defendant Misrepresents Plaintiff's Scholarly Activity and Teaching .. 9

        3.  Defendant Deviates from Standard Reappointment Procedure ........... 12

        4.  Comparison to Other Faculty Members' Performance ...................... 14

POINT II
PLAINTIFF HAS ESTABLISHED RETALIATED AGAINST HIM
IN VIOLATION OF THE FMLA ...................................................................... 17

    A.  Plaintiff Has Established Circumstances Giving Rise to an
        Inference of Retaliation .......................................................................... 18

        1.  Dave's Comments to Plaintiff and Others Constitute
            Direct Evidence of Retaliatory Intent .................................................. 19

        2.  Dave's Written Recommendations Constitute
            Direct Evidence of Retaliatory Intent .................................................. 20

B.  The Reasons Provided By Defendant Are Pretext ................................... 22

POINT III
DEFENDANT INTERFERED WITH PLAINTIFF'S RIGHTS
UNDER THE FMLA........................................................................................ 24


CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Bagley v. J.P. Morgan Chase & Co..,*
    10-CV-1592 (PGG), 2012 WL 2866266 (S.D.N.Y. July 12, 2012)..................... 14

*Bickerstaff v. Vassar Coll.,*
    196 F.3d 435 (2d Cir. 1999)............................................................................ 23

*Bowen-Hooks v. City of New York*,
    13 F.Supp.3d 179 (E.D.N.Y. 2014) ..................................................................... 4

*Brynie v. Town of Cromwell, Bd. of Educ.,*
    243 F.3d 93 (2d Cir. 2001)............................................................................. 15

*Coutard v. Municipal Credit Union,*
    848 F.3d 102 (2d Cir. 2017)........................................................................... 19

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................... 2

*Donnelly v. Greenburgh Cent. Sch. Dist.,*
    691 F.3d 134 (2d Cir. 2012)........................................................................... 18

*Ellis v. 21 Dept. Stores,*
    975 F.Supp.2d 244 (E.D.N.Y. 2013) ................................................................. 5

*Eka v. Brookdale Hosp. Med. Center,*
    247 F.Supp.3d 250 (E.D.N.Y. 2017) ................................................................. 3

*Espinal v. Goord,*
    558 F.3d 119 (2d. Cir. 2009).............................................................................. 8

*Gallo v. Prudential Residential Serv.,*
    22 F.3d 1219 (2d Cir. 1994).............................................................................. 2

*Geras v. Hempstead Union Free School Dist.,*
    149 F.Supp.3d 300 (E.D.N.Y. 2015) ......................................................... 14, 23

*Gordon v. City of New York,*
    14-CV-6115 (JPO), 2018 WL 4681615 (S.D.N.Y. Sept. 28, 2018)..................... 19

*Gorman-Bakos v. Cornell Coop. Extension,*
    252 F.3d 545 (2d Cir. 2001).............................................................................. 8

*Graham v. Henderson,*
   89 F.3d 75 (2d Cir. 1996)..................................................................... 2

*Griffin v. Ambika Corp.,*
   103 F.Supp.2d 297 (S.D.N.Y. 2000) ................................................... 2

*Henry v. Wyeth Pharmaceuticals,*
   134 F.3d 149 (2d. Cir. 2010)............................................................ 19

*Holtz v. Rockefeller & Co., Inc.,*
   258 F.3d 62 (2d Cir. 2001)........................................................... 2, 17

*Holmes v. Brentwood Union Free School Dist.,*
   2008 WL 1581434 (E.D.N.Y. May 25, 2006) .................................. 15

*Infantolino v. Joint Industry Bd. of Elec. Industry,*
   582 F.Supp.2d 351 (E.D.N.Y. 2008)............................................. 8, 9

*Jacobson v. Capital One Financial Corp.,*
   16-CV-06169 (CM), 2018 WL 6817064 (S.D.N.Y. Dec. 12, 2018).................... 17

*Jeffreys v. City of New York,*
   426 F.3d 549 (2d. Cir. 2005)............................................................. 2

*Jute v. Hamilton Sundstrand Corp.,*
   420 F.3d 166 (2d Cir. 2005)............................................................. 4

*Kiernan v. Town of Southampton,*
   734 Fed.Appx. 37 (2d Cir. 2018) ..................................................... 7

*Knight v. U.S. Fire Ins. Co.,*
   804 F.2d 9 (2d Cir. 1986)................................................................ 17

*Ladepo v. United Cerebral Palsy of New York City, Inc.,*
   15-CV-7026 (VSB), 2018 WL 4356726 (S.D.N.Y. Sept. 12, 2018) .................. 24

*La Grande v. DeCrescente Distrib. Co.,*
   Fed.Appx. 206 (2d Cir. 2010) .......................................................... 4

*Lewis v. American Sugar Refining, Inc.,*
   325 F.Supp.3d 321 (S.D.N.Y. 2017) ................................................ 3

*Mace v. Marcus Whitman Cent. School Dist.,*
   11-CV-6574 (FPG), 2015 5682665 (W.D.N.Y. 2015)........................ 20

*Mandel v. County of Suffolk,*
    316 F.3d 368 (2d Cir. 2003)..................................................................... 3

*McCarthy v. Dun & Bradstreet Corp.,*
    484 F.3d 184 (2d Cir. 2007)..................................................................... 2

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ............................................................................. 3, 17

*Metropolitan Transportation Authority Bus Company,*
    15-CV-5727 (AMD), 2017 WL 3328166 (E.D.N.Y. Aug. 3, 2017)...................... 7

*Mihalik v. Credit Agricole Cheuvruex North Amierca, Inc.,*
    715 F.3d 102 (2d Cir. 2013)..................................................................... 3

*Monterroso v. Sullivan & Cromwell, LLP,*
    591 F.Supp.2d 567 (S.D.N.Y. 2008) ...................................................... 8

*Potenza v. City of New York,*
    365 F.3d 165 (2d Cir. 2004)..................................................................... 17

*Ramos v. Marriot Intern., Inc.,*
    134 F.Supp.2d 328 (S.D.N.Y. 2001) .................................................... 12

*Rule v. Brine, Inc.,*
    85 F.3d 1002 (2d Cir. 1996)..................................................................... 2

*Sassone v. Quartararo,*
    598 F.Supp.2d 459 (S.D.N.Y. 2009) ...................................................... 8

*Schmitt v. City of New York,*
    15-CV-5992 (LG), 2018 WL 5777019 (E.D.N.Y. Nov. 1, 2018).......................... 2

*Shain v. Center for Jewish History, Inc.,*
    418 F.Supp.2d 360 (S.D.N.Y. 2005) ...................................................... 17

*Skates v. Incorporated Village of Freeport,*
    15-CV-1136 (SJF) (AYS), 2016 WL 145969 (E.D.N.Y. Jan. 28, 2016) ............. 18

*Smith v. North Shore – Long Island Jewish Health System,*
    286 F.Supp.3d 501 (E.D.N.Y. 2018)...................................................... 21

*Smith v. Westchester County,*
    769 F.Supp.2d 448 (S.D.N.Y. 2011) ...................................................... 24

*Sorlucco v. New York City Police Department,*
   888 F.2d 864 (2d Cir. 1992)............................................................................. 8

*Stern v. Trustees of Columbia University,*
   131 F.3d 305 (2d Cir. 1997)........................................................................... 14

*Summa v. Hofstra University,*
   708 F.3d 115 (2d Cir. 2013)............................................................................. 3

*Thompson v. North Am. Stainless, LP,*
   562 U.S. 170 (2011) ........................................................................................ 4

*Vasquez v. Empress Ambulance Serv., Inc.,*
   835 F.3d 267 (2d Cir. 2016)........................................................................... 23

*Williams v. Regus Management Group LLC,*
   836 F.Supp.2d 159 (S.D.N.Y. 2011) .............................................................. 12

*Woods v. START Treatment & Recovery Ctrs., Inc.,*
   864 F.3d 158 (2d Cir. 2017)........................................................................... 19

*Yu v. New York City Housing Development Corp.,*
   2011 WL 2326892 (S.D.N.Y. 2011) .............................................................. 17

**STATUTES**

29 C.F.R. § 825.220 ........................................................................................... 24

29 C.F.R. § 825.302 ........................................................................................... 18

Title VII of the Civil Rights Act of 1964 ....................................... 1, 3, 4, 5, 6, 8, 14, 17

New York State Human Rights Law .............................................. 1, 3, 4, 5, 6, 8, 14, 17

New York City Human Rights Law ................................................ 1, 2, 3, 4, 5, 6, 14, 17

Family Medical Leave Act ........................................... 1, 17, 18, 19, 20, 21, 22, 23, 24, 25

## PRELIMINARY STATEMENT

In the Fall of 2012, Plaintiff Sarsvatkumar Patel began working at Defendant Long Island University ("LIU") as an Assistant Professor at the University's College of Pharmacy. In early 2015, Plaintiff had been unanimously reappointed twice, and was on the path towards eventually receiving tenure, when things dramatically changed. He chose to submit an Affidavit in support of a co-worker suing LIU for discrimination, and he took a leave of absence pursuant to the Family Medical Leave Act ("FMLA") in order to provide care for his newborn child. Within a matter of months of engaging in both protected activities, LIU retaliated by denying his third application for reappointment, leading to the termination of his employment.

The evidence in this case clearly establishes that LIU retaliated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"). In addition, the evidence shows that Defendant retaliated against Plaintiff for exercising his rights under the FMLA. Finally, the evidence demonstrates that Defendant interfered with Plaintiff's FMLA rights.

For the reasons set forth below, Defendant's motion for summary judgment should be denied.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Counterstatement Pursuant to Local Rule 56.1, the Defendant's Statement Pursuant to Local Rule 56.1 where not disputed, and the Declaration of Joshua Beldner and the exhibits annexed thereto for a full recitation of the facts relevant to the determination of this motion.[1]

---

[1] Unless cited directly to an Exhibit or a Declaration, all statements of fact contained herein are followed by a citation to the appropriate paragraph number of Plaintiff's Rule 56.1 Statement, which therein contain a more full citation to the appropriate source of the evidence supporting the fact asserted.

## ARGUMENT

The Second Circuit has long held that the granting of a motion for summary judgment is a drastic remedy which must be used "sparingly." *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219 (2d Cir. 1994). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In making this determination, the court "must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment, and determine whether there is a genuine dispute as to a material fact, raising an issue for trial. *McCarthy v. Dun & Bradstreet Corp.,* 484 F.3d 184 (2d Cir. 2007); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) ("evidence of the party opposing summary judgment is to be believed and all justifiable inferences are to be drawn in that party's favor.") In reviewing such a motion, "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York,* 426 F.3d 549 (2d. Cir. 2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996).

In particular, the Second Circuit has cautioned against granting summary judgment in employment discrimination cases because the employer's intent is often at issue and is difficult to determine. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 78 (2d Cir. 2001) ("direct evidence that an adverse employment action was motivated by discrimination, or a 'smoking gun,' is typically unavailable.") Indeed, "in the context of employment discrimination cases, summary judgment is 'ordinarily inappropriate' because the allegations therein require exploration into an employer's motivation and intent for an employment decision." *Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 306 (S.D.N.Y. 2000); *see also Schmitt v. City of New York,* 15-CV-5992 (LG), 2018 WL 5777019,

at *4 (E.D.N.Y. Nov. 1, 2018) ("where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.") (internal citations omitted).

## POINT I
## PLAINTIFF HAS ESTABLISHED RETALIATION CLAIMS AGAINST DEFENDANT UNDER TITLE VII, NYSHRL, AND NYCHRL

In determining whether summary judgment is warranted in employment discrimination and retaliation cases, courts utilize the well-known burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804, (1973). Under the *McDonnell Douglas* framework, a plaintiff must first establish each element of a *prima facie* case; a burden described as "minimal." *Mandel v. County of Suffolk,* 316 F.3d 368, 378 (2d Cir. 2003). In order to establish a prima facie case of retaliation, an individual must establish that: (1) he engaged in protected activity; (2) his employer was aware of the protected activity; (3) he suffered a materially adverse employment action; and (4) a causal connection between the protected activity and adverse action. *Summa v. Hofstra University,* 708 F.3d 115, 125 (2d Cir. 2013). Retaliation claims under the NYSHRL are reviewed under the same standard and framework as Title VII retaliation claims. *Lewis v. American Sugar Refining, Inc.,* 325 F.Supp.3d 321, 355 n.33 (S.D.N.Y. 2017). The "NYCHRL's retaliation provision is broader than Title VII's coverage and protects plaintiffs who 'oppose any practice forbidden under the NYCHRL from conduct reasonably likely to deter a person engaging in such action.'" *Eka v. Brookdale Hosp. Med. Center,* 247 F.Supp.3d 250, 284 (E.D.N.Y. 2017) (internal citations omitted). To prevail on a retaliation claim under the more lenient NYCHRL standard, "the plaintiff must show that [he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvruex North Amierca, Inc.*, 715 F.3d 102, 112 (2d Cir. 2013).

In this case, Plaintiff has satisfied his *prima facie* burden under Title VII, NYSHRL, and NYCHRL.

**A.     Plaintiff Engaged in Activity Protected By Title VII, NYSHRL, and NYCHRL**

It is undisputed that Plaintiff participated in a lawsuit commenced by his co-worker, Supriya Bavadekar, against LIU in which she alleged discrimination on the basis of her race, national origin, and alienage or citizenship status ("*Bavadekar* action"). (Pl. Ex. 56.1 at ¶ 87.1.) Plaintiff filed a sworn affidavit ("the Affidavit") in support of his co-worker wherein he alleged "I believe that Dr. Taft and Dr. Cutie discriminated against me on the basis of my race, national origin, and alienage or citizenship status." (Def. 56.1 at ¶ 89.)

Defendant's contention that Plaintiff's Affidavit does not constitute "protected activity" under Title VII is without merit. First, the language contained in Title VII makes clear that "protected activity includes both opposing discrimination proscribed by the statute and … participating in Title VII proceedings." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "Title VII's anti-retaliation provision is 'construed to cover a broad range of employer conduct." *Thompson v. North Am. Stainless, LP,* 562 U.S. 170, 173 (2011) Further, "it is not necessary that the conduct is actually prohibited by Title VII, but only that the plaintiff had a 'good faith belief' that such conduct was prohibited." *Bowen-Hooks v. City of New York*, 13 F.Supp.3d 179, 222 (E.D.N.Y. 2014); *see also La Grande v. DeCrescente Distrib. Co.*, Fed.Appx. 206, 212 (2d Cir. 2010) ("plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.") The primary focus is whether the complaint is in "sufficiently specific terms so that the employer is put

on notice that the plaintiff believes he or she is being discriminated against on the basis of [the protected status]." *Ellis v. 21 Dept. Stores,* 975 F.Supp.2d 244, 279 (E.D.N.Y. 2013).

While Defendant correctly states that the *Bavadekar* action involved discrimination claims brought pursuant to NYSHRL and NYCHRL, Plaintiff is not solely relying on the "participation" prong of the applicable provision to obtain Title VII protection in this case. Rather, by submitting sworn written testimony that clearly sets forth his belief that his direct supervisors at LIU discriminated against him on the basis of his race and national origin, Plaintiff was quite obviously opposing employment practices prohibited by Title VII. Defendant can hardly argue that Title VII does not prohibit discrimination based on race and national origin. Thus, Defendant's argument that Plaintiff did not engage in protected activity because the underlying *Bavadekar* matter was not brought pursuant to Title VII must be rejected.[2]

In addition, LIU's contention that Plaintiff's complaint of discrimination was not legitimate because he could not have possibly held a "good faith belief" that he was being discriminated against is absurd. In his Affidavit, Plaintiff discusses at length the reasons why he believed he was being unfairly targeted and discriminated against by the Division Director and Dean at the time. Specifically, Plaintiff explains that the Dean issued him a memo for "gross neglect of duty," without complying with the requisite steps contained in the CBA. In the Affidavit, Plaintiff asserts that the "neglect memo" omits many crucial facts and events, including many of the conversations he had with administrators prior to taking his trip to India, as well as the communications that he had with administrators and students while he was in India. Defendant's purported belief that Plaintiff's underlying allegations of discrimination are somehow meritless, or unreasonable under the

---

[2] Plaintiff's Affidavit also satisfies the "protected activity" element of Plaintiff's NYSHRL and NYCHRL claims, in that he was protesting and opposing behavior that is prohibited by those statutes. In addition, because the *Bavadekar* proceeding was brought pursuant to the NYSHRL and NYCHRL, Plaintiff's "participation" in the *Bavadekar* action satisfies the first element of the analysis under those statutes.

circumstances is completely irrelevant. Plaintiff's Affidavit provides a detailed basis as to why he believed he was discriminated against, and that is sufficient for establishing the first prong of the analysis under Title VII, NYSHRL, and NYCHRL.

**B.     Causal Connection Between Protected Activity and Adverse Action**

Defendant does not appear to argue that Plaintiff has not established the second and third elements of his *prima facie* analysis. Rather, Defendant asserts that Plaintiff cannot establish "a causal connection" between Plaintiff's protected activity his non-reappointment. This argument fails for several reasons. First, Defendant incorrectly asserts that Plaintiff was first subjected to an "adverse action" in August 2015 when he received the termination letter from Dr. Kane. In making such an argument, Defendant is asking this court to disregard the entire reappointment review process, and the significant roles played by Plaintiff's two direct supervisors – Division Director Rutesh Dave and Dean Stephen Gross. A careful review of the timeline of events is critical. According to LIU's Interrogatory Responses, Defendant first became aware of the Affidavit (and thus Plaintiff's protected activity) on February 27, 2015. (Pl. 56.1 at ¶ 92.11.) According to the deposition testimony of Dr. Dave, a meeting was held in March 2015 between University Counsel Matt Siebel, Dr. Dave, Dean Gross, and a female administrator, wherein they were specifically notified of Plaintiff's participation in the *Bavadekar* lawsuit against LIU. (Pl. at 56.1 at ¶¶ 92.4-92.5.) Mr. Siebel was handling the *Bavadekar* matter for LIU. (Pl. 56.1 at ¶ 87.2.)

Further, the documentary evidence demonstrates that Mr. Seibel and Vice President Jeffrey Kane were in possession of one of Dr. Dave's early draft recommendations of non-reappointment of Plaintiff as early as May 1, 2015. It is also undisputed that Dean Gross was involved in the drafting and revision process in early May 2015. (Pl. 56.1 at ¶ 96.16.) Dr. Dave also admitted that he spoke to Dean Gross during the period in which he was drafting his recommendation of non-

reappointment in early May, and that Dean Gross was in agreement that he was not going to be recommending Plaintiff for reappointment. (Pl. 56.1 at ¶ 117.4.) Therefore, the temporal proximity between Dave and Gross learning about Plaintiff's protected activity (March 2015) and their decision to issue recommendations of non-reappointment (May 2015) is a period of only two months.

Defendant's attempt to stretch the temporal period from two months to seven months by separating Dave and Gross's recommendations in May 2015 from Dr. Kane's "final decision" in August 2015 must be rejected.  Dr. Kane testified that when conducting his reappointment reviews, he "normally give[s] the greatest weight to what the dean had said." (Pl. 56.1 at ¶ 39.4.) Moreover, specifically with respect to Plaintiff's application for reappointment in 2015, Dr. Kane testified that he relied in large part on Dean Gross's written recommendation, and it is undisputed that Dean Gross relied on Dr. Dave's recommendation. (Pl. Ex. 56.1 at ¶¶ 116.1; 117.6.) It should also be noted that Dr. Kane testified that he "rarely" ever disagreed with Dean Gross's reappointment recommendations, and Dean Gross testified that he did not recall a single occasion in all of his years working at the College of Pharmacy in which Dr. Kane disagreed with one of his reappointment recommendations. (Pl. Ex. 56.1 at ¶¶ 39.5-39.6.) Thus, even though the ultimate act which officially caused Plaintiff to be eventually terminated occurred in August 2015, it is clear that the retaliation actually began in May 2015 with the written non-reappointment recommendations that were drafted and completed by Dr. Dave and Dean Gross. As such, the temporal proximity is two months, not the seven months argued by LIU. This temporal gap falls comfortably within the time period courts have found an inference of causal connection. *See Kiernan v. Town of Southampton,* 734 Fed.Appx. 37, 43 (2d Cir. 2018) (plaintiff established prima facie case of retaliation where gap between protected speech and adverse employment consequences was a period of "several months"); *Ivankovskaya v. Metropolitan Transportation Authority Bus Company,* 15-CV-5727 (AMD)

(MDG), 2017 WL 3328166, at *6 (E.D.N.Y. August 3, 2017) (temporal gap of two months); *Espinal v. Goord,* 558 F.3d 119, 129 (2d. Cir. 2009) (six months); *Sassone v. Quartararo,* 598 F.Supp.2d 459, 467 (S.D.N.Y. 2009) (six months.); *Infantolino v. Joint Industry Bd. of Elec. Industry,* 582 F.Supp.2d 351, 359-60 (E.D.N.Y. 2008) (two months); *Monterroso v. Sullivan & Cromwell, LLP,* 591 F.Supp.2d 567, 583-84 (S.D.N.Y. 2008) (five months); *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001) (five months).

Plaintiff has therefore established a *prima facie* case of retaliation under Title VII, NYSHRL, and NYCHRL.

**C.    The Reasons Provided By Defendant Are Pretext**

 Once the plaintiff establishes his *prima facie* case, the burden switches to the defendant to articulate nondiscriminatory reasons for its actions. *Sorlucco v. New York City Police Department,* 888 F.2d 864 (2d Cir. 1992). LIU has asserted that the decision to not reappoint and eventually terminate Plaintiff was based on "academic judgment," due to the "mediocre quality of his teaching based on student evaluations, his deficient scholarship resulting from his lack of both peer-reviewed journal articles and grants during his tenure at LIU, and merely satisfactory service." (Def. Memo at p. 17.) As set forth below, the reasons provided by LIU for its decision are contradicted by evidence in the record. Indeed, the reasons articulated by Defendant are not only false, but pretextual.

*1.    Dean Gross's Testimony Is Contradicted by the Entire Record*

At his deposition, Dean Gross was asked about the *Bavadekar* lawsuit, and whether he had any knowledge of Plaintiff's participation in it. Dean Gross testified that he had no knowledge whatsoever of the suit, and that he had no knowledge whatsoever that Plaintiff had any involvement in it. (Pl. 56.1 at ¶ 92.1.) However, Dr. Dave's testimony flatly contradicted Dean Gross's

testimony. In particular, Dr. Dave testified that Dean Gross was not only told by University Counsel Matt Siebel about the *Bavadekar* litigation in March 2015, but that he was specifically told of Plaintiff participation in it. (Pl. 56.1 at ¶¶ 92.3 – 92.5.) Dean Gross also denied having any input or involvement with respect to Dr. Dave's recommendation of Plaintiff. (Pl. 56.1 at ¶ 122.3.) However, the testimony of Dr. Dave and Dr. Kane, and the emails contained in the record conclusively demonstrate that Dean Gross's testimony is blatantly false, and that he was actively involved in the process in early May 2015.

Dean Gross's evasive, inconsistent, and somewhat befuddling testimony regarding material underlying facts can create a presumption that the "legitimate" reasons that he provided in his recommendation are nothing more than pretext.[3] *Infantolino v. Joint Industry Bd. of Elec. Industry,* 582 F.Supp.2d 351, 361 (E.D.N.Y. 2008). Moreover, as set forth below, even if the court was to disregard Dean Gross's apparent lack of candor, the underlying reasons for denying Plaintiff reappointment are directly contradicted by other evidence contained in the record.

2.   *Defendant Misrepresents Plaintiff's Scholarly Activity and Teaching*

One of the primary factors Defendant has asserted for Plaintiff's non-reappointment was his purported lack of publication while at LIU. Indeed, Dr. Dave attests in the sworn affidavit that he submitted in support of Defendant's motion that "at the time Plaintiff submitted his third reappointment application, he had not been published in a peer-reviewed journal while at LIU." (D's 56.1 at ¶ 110.) Likewise, in Dean Gross's recommendation, he wrote that Plaintiff had not achieved any "peer review publication" success. These allegations are *false*. In September 2013, while a member of the LIU faculty, a research article that Plaintiff co-authored entitled "Drug-

---

[3] Dean Gross also told FRC Chairperson Bupendra Shah that he would not be recommending Plaintiff for reappointment because of Plaintiff's opposition to the University and involvement in the *Bavadekar* lawsuit. (Pl. 56.1 at ¶¶ 92.9-92.10.)

excipient behavior in polymeric amorphous solid dispersions" was published in *The Journal of Excipients and Food Chemicals*. (Pl. 56.1 at ¶ 110.1.) This publication was clearly listed in the reappointment application that Plaintiff submitted in March 2015. (Pl. 56.1 at 111.2.) Defendant's repeated assertions that Plaintiff had not been published as of March 2015 are simply not true.

In addition, Plaintiff informed Dean Gross on May 14, 2015 that two of his manuscripts had been favorably reviewed by professional journals and would likely be published by those journals. (Pl. 56.1 at ¶ 122.11.) Plaintiff even emailed Dean Gross the letters that he had received from the editors-in-chief of the professional journals which accepted his papers. (Pl. 56.1 at ¶ 111.3.) Thus, Dean Gross's testimony that he had "no knowledge" that Plaintiff's papers had been accepted at the time he completed his written recommendation on May 28, 2015 is also false, and contradicted by the documentary evidence in the record. Notably, by July 2015, both papers that Plaintiff told Dean Gross would be published, were indeed published – in the *European Journal of Pharmaceutical Sciences,* and *The Journal of Pharmaceutical Sciences* – which are both considered "high impact" journals in the Pharmaceutical field. (Pl. 56.1 at ¶¶ 111.4-111.5; 111.8-111.9.) As such, at the time Dr. Kane purportedly conducted his "final review" in August 2015, Plaintiff had research articles published in three different scholarly publications as a member of LIU faculty.[4] And yet, Defendant still maintains that Plaintiff's alleged "lack of publication" was one of the primary reasons for the denial of his reappointment.

LIU also appears to disregard the fact that Plaintiff had ten professional poster presentations. Dean Gross acknowledged that ten poster presentations "was a good amount." (Pl. 56.1 at ¶ 122.13.) Dr. Dave testified that ten posters was "acceptable." (Pl. 56.1 at ¶ 122.15.) According to the CBA, the "Research, Publications, Grant Activity" section clearly lists "Poster presentations at

---

[4] Plaintiff was published for a ***fourth*** time while at LIU during the 2015-16 school year. (Pl. 56.1. at 111.7.)

professional meetings" as examples of scholarly activity. (Pl. 56.1 at ¶ 132.1.) Dr. Kane, however, testified that he didn't "place much weight on poster presentations." (D's 56.1 at ¶ 132.) Dr. Kane's decision to not credit Plaintiff's achievements which are considered scholarly activity under the CBA is itself indicative of pretext.

Defendant has also asserted that Plaintiff was not awarded any "grants" for his laboratory during his time at LIU. (D's 56.1 at ¶ 110.) This allegation is also *false*. In 2014, Plaintiff drafted and submitted a seven page application for a grant entitled "Quality-by-Design approach towards better content uniformity: Understanding the powder segregation tendency through accelerated powder segregation tester." (Pl. 56.1 at ¶ 110.2.) Plaintiff sought a grant for the use of patented scientific instrument (known as the Powderex) in order to study powder segregation and content uniformity in a systematic way. (Pl. 56.1 at ¶ 110.3.) The company who owned the patent to the instrument, GlobePharma Inc., accepted Plaintiff's grant application and entered into a contract with LIU allowing Plaintiff and the University to use the instrument. (Pl. 56.1 at ¶ 110.4.) Notably, it was Dr. Kane who signed the grant contract on behalf of LIU (in addition to Plaintiff). (Pl. 56.1 at ¶ 110.5.) Thus, the alleged "facts" underlying Defendant's explanation as to why Plaintiff did not adequately satisfy the "scholarly activity" component of its review are unsupported by the evidence.

Additionally, in justifying its decision not to grant Plaintiff reappointment, Defendant has also repeatedly characterized Plaintiff's teaching as "mediocre." The documentary evidence contained in the record, however, suggests otherwise. Indeed, a review of the student evaluations from each of the six courses that Plaintiff taught in Spring 2014, and Fall 2014 reveals that Plaintiff received an average score of 3.41 out of 4.00. (Pl. 56.1 at ¶ 101.1.) Moreover, the vast majority of comments from students were overwhelmingly positive. (Pl. 56.1 at ¶ 103.1.) Dr. Dave acknowledged that Plaintiff's student evaluation scores were "modestly good" and the FRC noted

11

that the scores were between average and above average. (Pl. 56.1 at ¶¶ 100.3; 118.1) Incredibly, however, Dean Gross would not even acknowledge the evaluation scores as being in the average to above average range, thus further weakening his credibility and suggesting pretext. (Pl. 56.1 at ¶ 122.9.) *See Williams v. Regus Management Group LLC,* 836 F.Supp.2d 159, 174 (S.D.N.Y. 2011) ("The factfinder may disbelieve the defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws."); *Ramos v. Marriot Intern., Inc.,* 134 F.Supp.2d 328, 345 (S.D.N.Y. 2001) ("a plaintiff may establish pretext and thereby successfully oppose summary judgment . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action.")

The reasons set forth by Defendant regarding Plaintiff's allegedly deficient teaching and scholarly activity are clearly belied by the evidence in the record, and therefore suggest pretext.

3.   *Defendant Deviates from Standard Reappointment Procedure*

In addition, it is undisputed that LIU departed from its clearly established procedures in reviewing Plaintiff's reappointment application in the Spring of 2015. At their depositions, Dr. Dave, Dean Gross, and Dr. Kane each testified that the process for reappointment at LIU is as follows: (1) a candidate for reappointment submits his or her application for reappointment to his her Division Director, who reviews the application, and issues a recommendation of reappointment or non-reappointment; (2) the application and recommendation is then forwarded to the Faculty Review Committee ("FRC"), which conducts its own review, and then issues a written recommendation of its own; (3) the application, the Division Director's recommendation, and the FRC's recommendation is then forwarded to the Dean, who conducts his own review, and issues a written recommendation; and (4) the application and all written three recommendations are

forwarded to the Vice President of Academic Affairs – Dr. Jeffrey Kane. (D's 56.1 at ¶ 36-39.) If the faculty member is to be reappointed, the Dr. Kane would essentially do nothing. If the faculty member is "non-reappointed," Dr. Kane sends a letter to the faculty member informing him or her that he or she will be terminated following the conclusion of the following school year. (D's 56.1 at ¶¶ 40-41.) Dean Gross testified that he does not review reappointment applications until he receives the documents from the FRC, and that he does have any input or involvement at an earlier stage. Dean Gross and Dr. Kane both testified that it is not customary for Dr. Kane to be involved in the reappointment process prior to Dr. Kane receiving the entire package from the Dean, which is at the end of the review process. (Pl. 56.1 at ¶¶ 39.1-39.3.)

Here, it is undisputed that the "normal" procedure for reviewing a candidate's reappointment application was not followed. In this case, (although Dean Gross somehow denies it), it is undisputed that Dean Gross, Dr. Kane, and University Counsel Matt Siebel were ***all actively involved*** at the very first step in the review process in early May 2015, in that they reviewed and suggested revisions to the recommendation that Dr. Dave drafted, and subsequently revised on multiple occasions. (Pl. 56.1 at ¶¶ 96.1-96.27; 116.2.) Indeed, the fact that: (1) Mr. Siebel was handling the *Bavadekar* litigation on behalf of LIU at the time; (2) had a meeting with Dean Gross and Dr. Dave to inform them of Plaintiff's participation in the *Bavadekar* litigation in March 2015; and (3) was actively involved in providing input with respect to Plaintiff's non-reappointment in early May 2015 is highly unusual and suspect. Indeed, Mr. Siebel, Dr. Kane, and Dean Gross even had a conference call to specifically discuss Plaintiff's application for reappointment on May 1, 2015. (Pl. 56.1 at ¶ 96.16.) This call is documented in a redacted email from Dean Gross to Dr. Dave one day later. (Pl. 56.1 at ¶ 96.16.)

Tellingly, Dean Gross testified that other than the situation involving Plaintiff's application for reappointment in May 2015, he could not recall a single occasion in which University Counsel

was ever involved in the reappointment process. (Pl. 56.1 at ¶ 36.7.) Dean Gross served as Dean of

the College of Pharmacy for approximately 25 years. (Pl. 56.1 at ¶ 17.2.) Thus, the fact that

University Counsel Matt Siebel and Dr. Kane played a role in reviewing and offering input with

respect to Plaintiff's reappointment application in early May 2015 was, as Dean Gross made clear,

a significant departure from procedural norms, and therefore is suggestive of pretext. *See Bagley v.*

*J.P. Morgan Chase & Co..,* 10-CV-1592 (PGG), 2012 WL 2866266, at *15 (S.D.N.Y. July 12,

2012) ("although violation of an organization's internal procedures alone is insufficient to create

an inference of discrimination or retaliation, failure to follow internal procedures can be evidence

of pretext."); *Geras v. Hempstead Union Free School Dist.,* 149 F.Supp.3d 300, 328 (E.D.N.Y.

2015) ("in certain circumstances, procedural irregularities may form basis to infer discriminatory

animus."); *Stern v. Trustees of Columbia University,* 131 F.3d 305, 314 (2d Cir. 1997)

("[d]epartures from procedural regularity," for example, "can raise a question as to the good faith

of the process where the departure may reasonably affect the decision.")

Defendant's significant departure from procedural norms in its review of Plaintiff's

application for reappointment in this regard was therefore further evidence of pretext.

4.    *Comparison to Other Faculty Members' Performance*

There were eleven faculty members in the College of Pharmacy who were eligible for

reappointment in Spring 2015. Plaintiff was the only faculty member who was denied

reappointment. In particular, Dean Gross recommended the reappointment of every single faculty

member who was up for reappointment, with the exception of Plaintiff. There is no evidence to

suggest that any faculty member, aside from Plaintiff, engaged in activity protected by Title VII,

NYSHRL, or NYCHRL. The Second Circuit has long held, "an employer's disregard or

misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated

justification for an employment decision." *Brynie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir. 2001); *Holmes v. Brentwood Union Free School Dist.,* 2008 WL 1581434, at * 5 (E.D.N.Y. May 25, 2006) ("the fact that Plaintiff's credentials appear somewhat superior has probative value and weighs in favor of a finding of pretext.")

 In Spring 2015, Dr. Dave and Dean Gross recommended the reappointment of Dr. Jun Yen-Yeh, who, like Plaintiff, was up for his third reappointment. (D's 56.1 at ¶ 134.) Defendant notes that Dr. Yen-Yeh █████████████████████████████████████████. (D's 56.1 at ¶ 137.) However, Plaintiff had already been published once while at LIU, and as of May 2015 he notified Dr. Dave and Dean Gross that two more of his research articles had been accepted, and were likely to be published. As of August 2015, Plaintiff and Dr. Yen Yeh ████████████ p█████. However, whereas Dr. Yen Yeh's █████████████████████, Plaintiff's was deemed unacceptable. Moreover, Plaintiff had ten poster presentations at professional conferences, and Dr. Yen Yeh ████████. (Pl. 56.1 at ¶ 137.2.) In addition, it was clear from each of Dr. Yen Yeh's ██████████████████████████████████████ ██████████████████████████████. (Pl. 56.1 at ¶ 137.1.) Further, while Dr. Yen Yeh █████████████, Plaintiff served on seven. (Pl. 56.1 at ¶ 108.1.) According to Dr. Dave's recommendation, Dr. Yen Yeh █████████████████████." (Pl. 56.1 at ¶ 137.3.) In contrast, Plaintiff mentored *seventeen* Ph.D. and M.S. students. (Pl. 56.1 at ¶ 108.7.) Given the foregoing facts, it is difficult to imagine how Defendant deemed Dr. Yen Yeh as sufficiently meeting the criteria under "teaching, scholarship, and service" in accordance with the CBA to warrant reappointment, while simultaneously determining that Plaintiff did not.

 Similarly, in the Spring of 2015, Dr. Shalonda Williams, like Plaintiff, applied for her third reappointment. (Pl. 56.1 at ¶ 134.3.) Dean Gross noted that Dr. Williams: (1) ███████████ ██████████████████████████████████████████████████████████████████

████████████████████████████████████. (Pl. 56.1 at ¶ 134.4.) Dean Gross recommended Dr. Williams for reappointment. Likewise, in the Spring of 2015, Dr. Yuliana Toderika, like Plaintiff, applied for her third reappointment. (Pl. 56.1 at ¶ 134.6.) Dean Gross noted that Dr. Toderika: (1) ████████████████████████████████████████████████████████████████████████████████████████. (Pl. 56.1 at ¶ 134.6.) Dean Gross recommended Dr. Toderika for reappointment.

Plaintiff's teaching, scholarship, and service credentials are clearly comparable to, if not superior to that of Dr. Yen Yeh, Dr. Williams, and Dr. Toderika. Each faculty member applied for their third year reappointment in the College of Pharmacy, reviewed by the same Dean. They were all subject to identical criteria laid out in the CBA, and were therefore were subject to the same performance expectations and standards. Given that the evidence in the record demonstrates that the reasons provided by LIU for denial of Plaintiff's reappointment are not accurate, and the significant deviation from procedural norms, Defendant's uneven review of Plaintiff's credentials in comparison to similarly situated faculty members who did not engage in protected activity is suggestive of pretext.

Finally, it must be noted that as of January 2014, Dean Gross was praising Plaintiff for having an "impossible skill set," and for teaching a difficult course (medicinal chemistry) that was not his specialty in an effort to ensure that Plaintiff remained at the College of Pharmacy. (Pl. 56.1 at ¶¶ 69.13-69.19.) And yet, between January 2014 and Spring 2015, Dean Gross's opinion regarding Plaintiff clearly turned negative, *despite his testimony that he did not notice any decline in Plaintiff's teaching performance, scholarly activity, or service between January 2014 and Spring 2015.* (Pl. 56.1 at ¶ 69.20.) Clearly, something caused Dean Gross to change his opinion. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could plausibly find that the reason for the change in Dean Gross's opinion towards Plaintiff was Plaintiff's participation

in the *Bavadekar* lawsuit, which Dean Gross learned about just months before issuing his recommendation non-reappointment.  It is axiomatic that the "responsibility of the court in deciding a summary-judgment motion 'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.'" *Yu v. New York City Housing Development Corp.,* 2011 WL 2326892, at \*22 (S.D.N.Y. 2011) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986)). Here, there are numerous disputed issues of material fact which will determine the outcome of this case. Likewise, it should be noted that "the issue of pretext is 'ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment.'") *Shain v. Center for Jewish History, Inc.,* 418 F.Supp.2d 360, 366 (S.D.N.Y. 2005) (quoting *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 78 (2d Cir. 2001)).

For the foregoing reasons, Defendant's motion for summary judgment as to Plaintiff's Tile VII, NYSHRL and NYCHRL claims should therefore be denied.

## POINT II
### PLAINTIFF HAS ESTABLISHED DEFENDANT RETALIATED AGAINST HIM IN VIOLATION OF THE FMLA

In this case, Plaintiff has also established that Defendant retaliated against him in violation of the FMLA. "The Second Circuit has held that at the summary judgment stage, FMLA retaliation claims should be analyzed under the *McDonnell Douglas* burden-shifting framework. *Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004)). In order to establish a *prima facie* claim of FMLA retaliation, "a plaintiff must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Jacobson v. Capital One Financial Corp.,* 16-CV-06169 (CM), 2018 WL 6817064, at \*32

(S.D.N.Y. Dec. 12, 2018) (citing *Donnelly v. Greenburgh Cent. Sch. Dist.,* 691 F.3d 134, 147 (2d Cir. 2012)). In its motion, Defendant concedes that Plaintiff has satisfied the first three elements of his *prima facie* burden. However, as set forth below, the evidence in the record clearly demonstrates that Plaintiff has established all four elements of his *prima facie* case.

**A.    Plaintiff Has Established Circumstances Giving Rise to an Inference of Retaliation**

Defendant asserts that "Plaintiff cannot establish that LIU denied his application for a third reappointment under circumstances giving rise to an inference of retaliation." (Def. Memo at p. 20.) To support its position, Defendant appears to initially contend that Plaintiff did not provide Defendant the requisite 30 days prior to taking FMLA leave. This argument is baffling for several reasons. First, an individual is not required to provide 30 days' notice in order to obtain FMLA protection from retaliation. Rather, the regulation requires the employee to provide the employer at least 30 days advance notice, if practicable, in order to create an obligation for the employer to grant the employee's request to utilize FMLA leave. *See 29 C.F.R. § 825.302.* In this case, Plaintiff is not alleging that Defendant did not grant his request for FMLA leave. Thus, Defendant's argument regarding notice is irrelevant. Moreover, the facts clearly demonstrate that Plaintiff ***did*** provide LIU with 30 days advance notice. Plaintiff's wife gave birth on January 1, 2015. Five weeks prior to that, Plaintiff emailed Dean Gross and stated, in part, "We are expecting a baby in the near future. I would like to take this opportunity to seek your permission for a possible leave of absence in the future." (Pl. 56.1 at ¶ 70.1.) Plaintiff's email sufficiently put LIU on notice of his need to take leave in the future. It is well settled that "it is not necessary for an employee to ask for FMLA leave by name." *Skates v. Incorporated Village of Freeport,* 15-CV-1136 (SJF) (AYS), 2016 WL 145969, at \*19 (E.D.N.Y. Jan. 28, 2016). Rather, as the Second Circuit recently made clear, "an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA

may apply." *Coutard v. Municipal Credit Union,* 848 F.3d 102, 111 (2d Cir. 2017). Notably, neither Dean Gross nor Dr. Dave notified the University's Human Resources Department of Plaintiff's leave request until the middle of January 2015. (Pl. 56.1 at ¶ 77.1-77.5.) In fact, Dean Gross testified that when Plaintiff emailed him on November 24, 2014: (1) he was unaware that the LIU even had an FMLA policy; (2) he didn't recall ever seeing LIU's FMLA policy; and (3) he was unaware that the leave Plaintiff was requesting – to care for a child – was covered by the FMLA. (Pl. 56.1 at ¶¶ 72.1-72.3.)

Nevertheless, regardless of notice, it is undisputed that Defendant did eventually grant Plaintiff FMLA leave beginning on February 1, 2015. Plaintiff returned on March 1, 2015. The critical issue for purposes of this motion is whether Defendant considered Plaintiff's FMLA leave as a "negative factor" when it made the decision to deny his application for reappointment. *Gordon v. City of New York,* 14-CV-6115 (JPO), 2018 WL 4681615, at *24 (S.D.N.Y. Sept. 28, 2018) (citing *Woods v. START Treatment & Recovery Ctrs., Inc.,* 864 F.3d 158, 169 (2d Cir. 2017)). Here, the evidence overwhelmingly suggests that Plaintiff's FMLA leave was a significant negative factor in Defendant's decision to deny his reappointment application.

1.    *Dave's Comments to Plaintiff and Others Constitute Direct Evidence of Retaliatory Intent*

The testimony in the record is clear that in February 2015, while Plaintiff was out on leave and visiting campus to assist his graduate students, Dr. Dave told Plaintiff ***"nobody takes this kind of leave, you cannot go just like this. This could affect your future reappointment and tenure."*** (Pl. 56.1 at ¶ 83.2.) The four factors that courts in the Second Circuit consider in determining whether a comment reflects discriminatory intent are: (1) who made the remark; (2) when the remark was made in relation to the employment decision; (3) the content of the remark; and (4) the context in which it was made. *Henry v. Wyeth Pharmaceuticals,* 134 F.3d 149 (2d. Cir. 2010).

19

Here, all four factors weigh in favor of finding Dave's comment probative of his retaliatory intent. First, Dr. Dave was the Division Director, Plaintiff's direct supervisor, and a decision-maker. Second, the comment was made in February 2015, which was while Plaintiff was on leave, just weeks before Plaintiff submitted his application for reappointment, and approximately two months before Dave issued the recommendation of non-reappointment. Third, the comment relates directly to Dave's view and feelings about Plaintiff's leave – which is that it would hurt his chances to continue working for the LIU in the future. Finally, the context in which the comment was made further demonstrates its probative value because it was made while Plaintiff was actually on leave, utilizing the FMLA. Indeed, one can hardly imagine a comment more probative of an individual's intent. Dave's comment constitutes direct evidence of his discriminatory and/or retaliatory intent. *See Mace v. Marcus Whitman Cent. School Dist.,* 11-CV-6574 (FPG), 2015 5682665, at *9 (W.D.N.Y. 2015) (comment from school administrator discussing teacher's candidacy for tenure was probative of intent because it was "directly related to the decision-making process.")

In addition to making the comment directly to Plaintiff, Dr. Dave admitted that he made comments at an Executive Committee meeting on February 5, 2015, just three days after Plaintiff went out on leave, regarding his concerns of how Plaintiff's FMLA leave would affect students. (Pl. 56.1 at ¶¶ 83.8-83.10.) The comments are memorialized in the official meeting minutes. (Pl. 56.1 at ¶ 83.10.) Further at his deposition, Dr. Dave testified that Plaintiff's leave made his life more difficult and "more chaotic than it needed to be," and that the way in which Plaintiff's took leave and returned from leave was "inappropriate." (Pl. 56.1 at ¶¶ 83.10-83.12.). He also testified that Plaintiff's leave "disrupted student learning." Dr. Dave also testified that Dean Gross agreed with his sentiment that Plaintiff's approach to taking FMLA leave was inappropriate. (Pl. 56.1 at ¶ 83.13.)

Direct evidence of retaliation may "include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'" *Smith v. North Shore – Long Island Jewish Health System,* 286 F.Supp.3d 501, 514 (E.D.N.Y. 2018) (internal citations omitted). Clearly, Dr. Dave's comments and deposition testimony (as well as the sentiment attributed to Dean Gross) constitutes direct evidence of animus against Plaintiff as a result of his taking FMLA leave.

2. <u>*Dave's Written Recommendations Constitute Direct Evidence of Retaliatory Intent*</u>

It is undisputed that prior to completing and signing the final copy, Dr. Dave drafted several versions of his written recommendation of non-reappointment of Plaintiff. (Pl. 56.1 at ¶¶ 96.1-96.13.) After drafting each version, Dr. Dave would hand it to Dean Gross, who would then return it with suggested revisions. (Pl. 56.1 at ¶ 96.3.) Each version contained multiple references to, and pointed criticism of Plaintiff's FMLA leave. (Pl. 56.1 at ¶¶ 96.1 – 96.27.) At some point, University Counsel Matt Siebel was provided a copy, and brought it to Dr. Kane's office and said ████████ ████████████████████████." (Pl. 56.1 at ¶ 96.19.) Dr. Kane testified that he typically only gets involved at the Division Director level of review if he "saw something that [he] thought violated the collective bargaining agreement or some other violation of the rights of the individual." (Pl. 56.1 at ¶ 39.2.) In this case, Dr. Kane specifically testified that he believed that Dr. Dave's recommendations were taking Plaintiff's FMLA leave into account. (Pl. 56.1 at ¶ 96.27.) Dr. Kane testified that he expressed concerns to Dean Gross regarding the repeated references Dr. Dave made to Plaintiff's FMLA leave, and that Dean Gross "pretty much understood what I was saying as a directive to not have this included in any review."  (Pl. 56.1 at ¶ 96.23-96.25.)

The final version of Dr. Dave's review removed all references to "FMLA," but continued to reference Plaintiff's leave of absence. (Pl. 56.1 at ¶ 96.12.) Despite the removal of "FMLA," Dr.

Kane was not satisfied because the third page of the recommendation still noted that Plaintiff's leave was *"a major concern."* (Pl. 56.1 at ¶ 96.26.) Dr. Kane testified that Dr. Dave's reference to Plaintiff's FMLA appeared "to be substantive, meaning it is a matter of considerable focus that it doesn't belong in the recommendation." (Pl. 56.1 at ¶ 96.24.) Dean Gross also testified that it appeared that Dr. Dave had a major concern with the FMLA leave that Plaintiff took. (Pl. 56.1 at ¶ 112.10.)

In this case, Plaintiff has established direct evidence of retaliatory intent based: (1) Dave's comments to Plaintiff; (2) Dave's comments to the Executive Committee; (3) Dave's deposition testimony in this case; (4) Dave's written recommendations which contain repeated references to Plaintiff's leave as a "major concern"; and (5) Dr. Kane and Dean Gross's testimony which confirm that Dave was considering Plaintiff's leave when he issued his letter of non-reappointment in Spring 2015. In addition, Plaintiff can rely on the indirect evidence of temporal proximity, as Plaintiff came back from leave March 1, 2015, and Dave and Gross issued recommendations of non-reappointment in May 2015 – just two months later.

Plaintiff has clearly established a *prima facie* case of FMLA retaliation.

## B.    The Reasons Provided By Defendant Are Pretext

As already set forth in Point I(B), *supra,* the "legitimate" reasons provided by Defendant for denying Plaintiff's reappointment are pretext. Defendant cannot sustain its argument that Plaintiff's work performance was "poor" or "substandard." Plaintiff was unanimously reappointed twice, and as of January 2014, Dean Gross was praising him in an effort to ensure that he remained with the University. Defendant's criticism of Plaintiff's teaching and scholarly activity and lack of publication is blatantly contradicted by the evidence in the record. Plaintiff's accomplishments and achievements compare favorably with faculty members who did not exercise their rights under the

FMLA. Further, Defendant's significant departure from its normal review process is further suggestive of pretext. In addition, Defendant's claim that "Dave and Gross advised that Plaintiff could apply for reappointment, negating any possible retaliatory animus" is simply false. Both Dave and Gross specifically testified that they did ***not*** tell Plaintiff that he had an opportunity to reapply for reappointment. (Pl. 56.1 at ¶¶ 143.2-143.4.)

Finally, any contention that Defendant should be entitled to summary judgment based on the argument that Dr. Kane was the "ultimate decision maker" and held no discriminatory animus must be rejected. First, he testified that in making his decision, he relied on the recommendation of Dean Gross. (Pl. 56.1 at ¶ 116.1.) According to Dr. Dave, Dean Gross also expressed his belief that Plaintiff's approach to taking FMLA leave was "inappropriate." (Pl. 56.1 at ¶¶ 83.12-83.13.) Moreover, Dean Gross consulted with Dr. Dave prior to issuing his recommendation, and took Dr. Dave's recommendation (which was clearly focused on Plaintiff's FMLA leave) into account when he issued his recommendation of non-reappointment. (Pl. 56.1 at ¶¶ 117.5-117.6.)  It is well settled that the "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision … even absence evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have impermissible bias played a meaningful role in the … process." *Geras v. Hempstead Union Free School Dist.,* 149 F.Supp.3d 300, 328 (E.D.N.Y. 2015) (quoting *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 450 (2d Cir. 1999)); *see also Vasquez v. Empress Ambulance Serv., Inc.,* 835 F.3d 267, 271-73 (2d Cir. 2016) (applying "cat's paw" theory of liability to conclude that discriminatory intent could be imputed to employer where adverse action was taken by a supervisor who "himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such motive and intended to bring about the adverse employment action.")  Defendant can hardly argue that Dr. Dave did not play a "meaningful role" in the reappointment process, or that he did not have any such retaliatory motive.

23

For the foregoing reasons, the evidence clearly demonstrates that Defendant impermissibly considered Plaintiff's FMLA leave when it denied his application for reappointment. As a result, Defendant's motion for summary judgment seeking dismissal of Plaintiff's FMLA retaliation claim should be denied.

## POINT III
## DEFENDANT INTERFERED WITH PLAINITFF'S RIGHTS UNDER THE FMLA

In order to establish an FMLA interference claim, a plaintiff must establish: (1) that he is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA. *Smith v. Westchester County,* 769 F.Supp.2d 448, 464-65 (S.D.N.Y. 2011). In order to establish FMLA interference, "a plaintiff must only establish that an "employer in some manner impeded the employee's exercise of his or her rights protected" by the FMLA." *Ladepo v. United Cerebral Palsy of New York City, Inc.,* 15-CV-7026 (VSB), 2018 WL 4356726, at *9 (S.D.N.Y. Sept. 12, 2018). Courts have held that "discouraging an employee from using FMLA leave could violate the employee's FMLA rights." *Smith,* 769 F.Supp.2d at 467 (citing 29 C.F.R. § 825.220(b)).

In this case, Dr. Dave's statement to Plaintiff that "nobody takes this kind of leave," and further telling him "this could affect your reappointment and tenure," compelled Plaintiff to cut his FMLA leave short and return to work earlier than he anticipated. (Pl. 56.1 at ¶¶ 83.2 -83.4.) Specifically, Plaintiff testified that when he heard the comments by Dave, he "felt compelled" to come back "because I was worried about my job." (Pl. 56.1 at ¶ 83.3.). Defendant's contention that Dave's remarks would not have dissuaded a similarly situated employee from continuing with their FMLA leave is without merit. Plaintiff's reaction to his direct supervisor telling him that his FMLA

24

leave could affect his reappointment and tenure was objectively understandable, and reasonable under the circumstances. As such, a jury will likely find that Dave's discouraging words constituted unlawful "interference" within the meaning of the statute. Finally, Defendant's argument that Plaintiff's claim is "time-barred" misses the mark. "An alleged FMLA violation is willful if an employer either knew or recklessly disregarded whether its conduct violated the FMLA." *Smith,* 769 F.Supp.2d at 463. Dave testified that he knew as of November 2014 that Plaintiff's request for leave was the kind of leave covered by the FMLA. (Pl. 56.1 at ¶ 74.4.) He also participated in a meeting with Dean Gross and Plaintiff wherein it was agreed that Plaintiff would utilize FMLA leave. (Pl. 56.1 at ¶ 81.3.) Defendant can hardly argue, much less prove, that Dr. Dave did not willfully or intentionally interfere with Plaintiff's FMLA rights when he told him "nobody takes this kind of leave," and that it "would affect his reappointment and tenure" while Plaintiff was utilizing FMLA leave. The applicable statute of limitations is three years. Thus, Plaintiff's interference claim is timely.

Defendant's motion for summary judgment as to Plaintiff's interference claim must therefore be denied.

## CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment should be denied in its entirety, and Plaintiff should be awarded such other relief that the court deems just and proper.

Dated: Uniondale, NY
        January 9, 2019

Joshua Beldner, Esq.

**TILTON BELDNER LLP**
626 RXR Plaza
Uniondale, NY 11556
P: (516) 262-3602
F: (516) 324-3170